TYRUS L. COOPER,

                              Plaintiff,

v.                                                          Case No. 24-cv-414-pp

JOSEPH KRAUS and MICHAEL WATSON,

                              Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 28) AND DISMISSING CASE**

---

Plaintiff Tyrus L. Cooper, who is incarcerated at Oshkosh Correctional Institution and is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. The court screened the complaint and allowed the plaintiff to proceed on an Eighth Amendment claim based on allegations that the defendants left the plaintiff in his cell handcuffed behind his back with the knowledge that he had a seizure disorder, that the cell did not have an emergency button and that the plaintiff subsequently suffered a seizure. Dkt. No. 9 at 7. The defendants have filed a motion for summary judgment. Dkt. No. 28. This order grants the defendants' motion and dismisses the case.

## I.      Facts[1]

The plaintiff was incarcerated at Columbia Correctional Institution during the events described in the complaint. Dkt. No. 30 at ¶1. The

---

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

defendants were employed by the Wisconsin Department of Corrections as sergeants at Columbia during that time. Id. at ¶¶2-3.

    A.    <u>Plaintiff's Seizure Condition</u>

On February 2, 2023, after he had not been taking his seizure medication (divalproex), the plaintiff was seen by Nurse Tricia Waddell. Dkt. No. 30 at ¶5. Although the plaintiff reported that he had been taking this medication since he was a child and that he had not experienced a seizure in approximately a year and a half, he said he wanted to stop taking the medication based on advice from his mother. Id. at ¶6; Dkt. No. 48 at ¶3. The plaintiff reported that his mother is a nurse and believed that he was experiencing side effects from the medication. Dkt. No. 30 at ¶6. Waddell told the plaintiff that he would need to be seen by neurology before he could be placed on a new medication and that he had an upcoming telehealth visit with UW Neurology. Id. at ¶7. After the plaintiff's telehealth visit with UW Neurology, he was scheduled for testing on May 31, 2023. Id. at ¶8. The plaintiff refused to participate in the testing and was sent back to the institution. Id. Apparently the plaintiff did not participate because he wasn't feeling well, and he asked that the appointment be rescheduled. Dkt. No. 48 at ¶4.

    B.    <u>November 10, 2023 Incident</u>

On November 10, 2023, defendant Kraus worked as shift sergeant at Columbia's restricted housing unit (RHU) from 6:00 a.m. to 6:00 p.m. Dkt. No. 30 at ¶9. During that shift, Kraus was training defendant Watson, a new sergeant, on proper RHU procedures and protocols. Id. at ¶10. At about 5:30 p.m., the defendants were returning the plaintiff's cellmate to Cell 10 on the second tier of RHU after a video visit. Id. at ¶11. For officer safety, when RHU

cell doors are opened for transfers of incarcerated individuals, both the individual being moved and his cellmate must be handcuffed. Id. at ¶12.

As the defendants approached Cell 10, Kraus knocked on the cell door to get the plaintiff's attention and asked the plaintiff to come to the cell front so that he could be handcuffed. Dkt. No. 30 at ¶13. The plaintiff approached, and Kraus placed his handcuffs on the plaintiff. Id. at ¶15. Once the handcuffs were on the plaintiff, the plaintiff stepped to the back of the cell. Id. Kraus then used his keys to unlock and open the cell door. Id. at ¶16. Watson removed the belt from around the plaintiff's cellmate's torso so that only the handcuffs remained. Id. at ¶17. The cellmate then stepped inside the cell and the cell door was closed. Id. While waiting for Watson to remove the handcuffs through the cell door trap, Kraus walked about twenty feet away to a cell front to speak with another incarcerated individual. Id. at ¶18. Once Watson had collected his mechanical restraints from the plaintiff's cellmate, he closed the door trap, put his keys away and began folding up the waist belt as he approached Kraus at the other cell front. Id. at ¶20. Watson stood by while Kraus finished his conversation with the other incarcerated person. Id. The defendants then walked to the stairwell to go downstairs and continue their work. Id.

About thirty seconds elapsed from the time Watson closed Cell 10's trap door and the time that the defendants exited the hallway and entered the stairwell. Dkt. No. 30 at ¶21. The parties dispute whether the plaintiff yelled at the defendants before they left the hallway. The plaintiff states that when he realized that the defendants were leaving the tier without uncuffing him, he and his cellmate yelled at them to come back and uncuff him. Dkt. No. 48 at ¶¶13, 42, 47. He says that the defendants ignored the yelling and left the tier without removing the cuffs. Id. at ¶14. According to the defendants, neither the

plaintiff nor his cellmate yelled "you left me handcuffed," or anything else to that effect at any time, nor did they bang on the door to get the defendants' attention. Dkt. No. 30 at ¶41. The defendants state that had the plaintiff or his cellmate tried to notify them of the situation, they would have returned to the cell front immediately to remove the plaintiff's handcuffs. Id. at ¶42.

After the defendants left the cell, the plaintiff became paranoid that he was vulnerable to his cellmate because the plaintiff was handcuffed. Dkt. No. 48 at ¶17. While uncuffed, no such concern existed because the plaintiff could defend himself. Id. at ¶18. The plaintiff was not friends with his cellmate and was concerned about his inability to defend himself if his cellmate attacked him. Id. at ¶20.

About twenty-five minutes after the defendants left, an incarcerated worker who was tasked with cleaning arrived on the wing. Dkt. No. 30 at ¶23. While he was working, the stairway door closed, and he temporarily was detained in the plaintiff's hallway for about ten minutes. Id. During that time, he stood by and had a conversation with an incarcerated individual in Cell 1, about thirty to forty feet from the plaintiff's cell front. Id. The video footage submitted in evidence does not show the worker reacting in a way that would indicate that the plaintiff or his cellmate was calling out for help during the worker's ten-minute stay on the wing. Id. The plaintiff states that he did not know that the worker was on the tier. Dkt. No. 48 at ¶16. He says that he was waiting for an officer to make a round to get his attention. Id.

About seven minutes after the worker left the wing, members of security staff, including Watson, heard a commotion upstairs. Id. at ¶24. Watson was one of the three officers who immediately responded. Id. Due to the layout of the cells and hallway, noise carries significantly. Id. at ¶22. In Officer Nicholas

4

Wollyung's Incident Report #584626, he states that he was able to hear "banging and shouting of a medical emergency" around 6:16 p.m. from where he was in the Unit 2 Dayroom, between thirty to fifty yards away from Cell 10 depending on where in the dayroom he was. Id.

When security staff arrived, it appeared that the plaintiff was having a seizure. Dkt. No. 30 at ¶25. Sergeant Walker initiated the emergency alert via radio. Id. Security staff secured the plaintiff's cellmate and removed him from the cell so that the plaintiff could be medically assessed. Id. After the plaintiff appeared to stabilize, security staff placed restraints on him. Id. at ¶26. Nurses Kaitlyn Cole and Steve Fahrenkrug arrived within three minutes and entered the cell. Id. Cole observed the plaintiff laying on the cell floor on his right side, having "seizure-like activity" for about two minutes. Id. at ¶27. Cole and Fahrenkrug ensured that the plaintiff was not at risk for further injuring himself by clearing the area, protecting his head and monitoring his breathing. Id. at ¶28.

After the seizure concluded, the plaintiff at first was confused about what had happened. Dkt. No. 30 at ¶29. Cole explained that the plaintiff appeared to have experienced a seizure, and the plaintiff responded that he had a history of seizures. Id. After sitting up and taking some deep breaths, the plaintiff stated that type of seizure was not common for him. Id. Cole completed an initial assessment for injuries, then the plaintiff was transferred to the health services unit (HSU) for further evaluation. Id. at ¶30. At the HSU, Cole noted that the plaintiff's vital signs were stable and that he was alert and oriented. Id. at ¶31. The plaintiff's pupils were responsive to light, he did not bite his tongue and he had no incontinence episode during the seizure. Id. The plaintiff reported no

shortness of breath and no weakness or numbing. Id. Cole did not note any swelling, bruising or laceration to the plaintiff's head. Id.

During the evaluation, the plaintiff stated that he had not missed any doses of his prescribed anti-seizure medication, Depakote. Dkt. No. 30 at ¶32. But the plaintiff's Medication Administration Record showed that he refused to take divalproex sodium (Depakote) on November 7, 8 and 9—the three days leading up to this event on November 10, 2023. Id. at ¶33. According to the plaintiff, he *did* take Depakote on November 7, 8 and 9, 2023. Dkt. No. 48 at ¶¶29-32.

Cole called Dr. Laura Sukowaty, associate medical director for the DOC, to review the results of her evaluation. Dkt. No. 30 at ¶34. Id. Sukowaty ordered an extra 500 mg dose of Depakote, on top of the plaintiff's existing 1000 mg dose. Id. Tylenol also was ordered per nursing protocol. Id. While Cole was dispensing the medication to the plaintiff, the plaintiff restated to Cole that he had been taking his Depakote and had not missed a dose. Id. at ¶35. Because the plaintiff's vital signs were stable, his neurological and musculoskeletal assessments were within normal limits, and he had been given an extra dose of his anti-seizure medication, there was no need for continued monitoring. Id. at ¶36. The plaintiff was medically cleared to return to his cell. Id. The plaintiff denied further questions or concerns, and did not express any apprehension about his personal safety with his cellmate. Id. at ¶37. There was no reason to believe that the cellmate posed any risk to the plaintiff. Id. If there had been, Cole would have recommended that the plaintiff and his cellmate be separated and not housed together. Id. Once the plaintiff was medically cleared, he returned to Cell 10 with his cellmate. Id. at ¶38. The defendants

6

state that the plaintiff never alleged or expressed concern of being assaulted by his cellmate. Id. at ¶39.

Kraus's shift ended at 6:00 p.m., sixteen minutes before officers responded to incarcerated individuals yelling on the second tier of the RHU near Cell 10. Id. at ¶43. The defendants state that Kraus was not aware until the following day that the plaintiff had been left handcuffed in his cell. Id. The plaintiff states that as long as he was not restrained with mechanical handcuffs, he felt no apprehension about being housed with his cellmate because he had the ability to defend and protect himself. Dkt. No. 48 at ¶36. The plaintiff states that after recovering from his seizures, he said that he believed the seizures occurred because of acute emotional distress from the anxiety he felt of being helpless and unable to defend himself. Id. at ¶38.

The defendants state that neither defendant believed that the plaintiff's cellmate posed any risk to the plaintiff. Dkt. No. 30 at ¶45. If they had, they would have recommended that the two be separated and not housed together. Id. The plaintiff's cellmate was not a threat under normal circumstances. Dkt. No. 48 at ¶61. But the plaintiff says that he was not secure in his person when left alone with his cellmate while the plaintiff was fully restrained and helpless and his cellmate was not restrained. Id. at ¶62.

The parties dispute what Kraus said to the plaintiff after the incident. According to the defendants, Kraus spoke with the plaintiff after the incident and asked why he did not simply ask to have his cuffs removed. Dkt. No. 30 at ¶44. The defendants say that the plaintiff only smiled in response to Kraus's question. Id. According to the plaintiff, when Kraus talked to the plaintiff after the incident and played dumb, the plaintiff grimaced and said, "So that's how it's going to be. You know we yelled for you to return and you ignored us." Dkt.

7

No. 48 at ¶59. The plaintiff says that Kraus responded, "Maybe next time you'll just ask nicely to have the handcuffs removed." Id. at ¶60.

Neither defendant had prior knowledge of the plaintiff's history of seizures. Dkt. No. 30 at ¶46. Neither defendant had the authority to add any kind of emergency response button for incarcerated individuals experiencing a medical episode. Id. at ¶47.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.     Discussion

The defendants contend that they are entitled to summary judgment because they did not act with deliberate indifference. Dkt. No. 29 at 8. Although the defendants concede for the purpose of summary judgment that the plaintiff's seizure constituted a serious medical need, they assert that leaving the plaintiff in his cell while handcuffed was, at most, an honest mistake that does not amount to a constitutional violation. Id. at 8-9. The defendants state that they did not know that the plaintiff faced a substantial risk of harm because they were not aware that he had a history of seizures, that the plaintiff's cellmate posed any threat to him or that the plaintiff and his cellmate yelled to have the plaintiff's handcuffs removed. Id. at 11. They also contend that the court must dismiss the case because the plaintiff has not presented expert testimony that being handcuffed caused his seizure. Id. at 11-12. Finally, the defendants contend that they are entitled to qualified immunity. Id. at 13-14.

The plaintiff responds that factual disputes preclude summary judgment. Dkt. No. 46 at 7. He states that contrary to the defendants' assertions, he and his cellmate called out very loudly for the defendants to return to the cell. Id. The plaintiff also states that he has established a causal link between the defendants' action and his injuries. Id. He says that it is well established that heightened stress and emotional anxiety are major contributing factors to the onset of seizures. Id. at 1-2. The plaintiff maintains that whether the stress and emotional anxiety that surrounded his seizures caused the seizures or was a contributing cause of the seizures is a question for the jury. Id. at 2. He also

9

contends that the court should allow him to proceed on a claim against Kraus for failing to properly train and supervise Watson. Id. at 8. Finally, the plaintiff contends that the defendants are not entitled to qualified immunity. Id. at 10.

A prison official's deliberate indifference to a substantial risk of serious harm to an incarcerated individual violates the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 829 (1994) (citing Helling v. McKinney, 509 U.S. 25 (1993)). The deprivation must be, objectively, "sufficiently serious[.]" Id. (citation omitted). For a claim based on failure to prevent harm, the incarcerated person must show that he was incarcerated under conditions posing a substantial risk of serious harm. Id. (citing Helling, 509 U.S. at 35). In addition, the prison official must have a "sufficiently culpable state of mind[];" in prison conditions cases, that state of mind is one of "deliberate indifference" to the health or safety of the incarcerated individual. Id. "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measure to abate it." Id. at 847.

At screening the court allowed the plaintiff to proceed on an Eighth Amendment claim that the defendants allegedly left the plaintiff in his cell handcuffed behind his back with the knowledge that he had a seizure disorder and that the cell did not have an emergency button. Dkt. No. 9 at 7. But now, at the summary judgment stage, it is undisputed that the defendants did not know that the plaintiff had a seizure disorder. Because the defendants did not know the plaintiff had a seizure disorder, the parties' dispute over whether the defendants heard the plaintiff and his cellmate yell that they left handcuffs on the plaintiff before they left the tier is immaterial.

It is undisputed that after they returned the plaintiff's cellmate to the cell, the defendants left the plaintiff handcuffed in the cell. The plaintiff does not contend that they did so intentionally. At most, the evidence supports the conclusion that their act of leaving the handcuffs on the plaintiff was negligent. The parties dispute whether the plaintiff and his cellmate yelled at the defendants to remove the handcuffs before the defendants left the hallway. The plaintiff states that when he realized that the defendants were not returning to remove his handcuffs, he and his cellmate yelled for them to return and that the defendants must have heard them. The defendants assert that they did not hear the plaintiff and his cellmate yelling before they left the cell hall. Even assuming that the defendants did hear the plaintiff and his cellmate, the plaintiff has not established that the defendants knew he faced a substantial risk of serious harm. It is undisputed that the defendants did not know that the plaintiff had a history of seizures or that he took seizure medication. The parties dispute whether the plaintiff had stopped taking his anti-seizure medication three days before the incident. This dispute also is immaterial to the question of whether the defendants acted with deliberate indifference, because they did not know the plaintiff had a seizure condition.

The plaintiff asserts that although his cellmate posed no threat to him when the plaintiff was not handcuffed, he did pose a threat when the plaintiff was handcuffed because the plaintiff could not defend himself. He states that the security precautions taken with incarcerated individuals in the RHU (also known as segregation) show that the plaintiff faced a substantial risk of harm from being left in the cell with his cellmate while handcuffed. But it is undisputed that the defendants did not know that the plaintiff faced any threat from his cellmate. The plaintiff contends that the fear of being handcuffed in

11

his cell, with his cellmate who was not cuffed, caused his seizure. Again, the defendants did not know the plaintiff had a seizure condition, so they cannot be liable for the conditions that the plaintiff says caused him to have one. See LaBrec v. Walker, 948 F.3d 836, 841 (7th Cir. 2020) (prison official does not act with deliberate indifference unless official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and the official "draw[s] that inference").

Because the defendants did not know about the plaintiff's seizure history and were not aware of any threat from the plaintiff's cellmate, they cannot be liable for leaving the plaintiff handcuffed in his cell for less than an hour. While it is very unfortunate that the plaintiff suffered a seizure, a reasonable factfinder could not conclude that the defendants acted with deliberate indifference. The defendants are entitled to summary judgment on their Eighth Amendment claim.

The plaintiff states that he wants to pursue a claim against Kraus for failing to supervise Watson and that the court should have allowed him to proceed on such a claim when it screened the complaint. The plaintiff's complaint did not allege a failure-to-train claim against Krause. Dkt. No. 1 at ¶28. Even if he had, §1983 limits liability to public employees who are personally responsible for a constitutional violation. Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009). For liability to attach, the individual defendant must have caused or participated in a constitutional violation. Hildebrandt v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003). As for supervisors, the personal responsibility requirement is satisfied if the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent. Id. In other words, the supervisor "must

know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." Id. (quoting Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)).

The court allowed the plaintiff to proceed against Kraus on a claim that Krause knowingly left the plaintiff handcuffed in his cell with the knowledge that he suffered from seizures and that the cell did not have an emergency button. Dkt. No. 9 at 7. The evidence on summary judgment does not support that claim, and therefore does not show that Krause violated the plaintiff's constitutional rights. Because the plaintiff has not produced sufficient evidence to allow a reasonable factfinder to determine that Krause (or anyone else) violated the plaintiff's constitutional rights, there is no basis for the court to find that Krause failed to supervise Watson.

Finally, because the "facts presented, taken in the light most favorable to the plaintiff," do not "describe a violation of a constitutional right," Smith v. Finkley, 10 F.4th 725, 737 (7th Cir. 2021), the court need not determine whether the defendants are entitled to qualified immunity.

The court will grant the defendants' motion for summary judgment, issue judgment in the defendants' favor and dismiss the case.

## III. Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 28.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this

13

deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court.* <u>See</u> Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. <u>Id.</u>

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 23rd day of March, 2026.

BY THE COURT:

_____

HON. PAMELA PEPPER
Chief United States District Judge

14